*NOT FOR PUBLICATION*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
                                          :
JOSEPH BRANDO,                            :
                                          :
                                          :
                         Plaintiff,       :
                                          :        Civil Action No. 15-3219 (FLW)
          v.                              :
                                          :             **OPINION**
CAROLYN W. COLVIN,                        :
Acting Commissioner of Social Security,   :
                                          :
                         Defendant.       :
_____          :

**WOLFSON, United States District Judge**:

Joseph Brando ("Plaintiff"), appeals from the final decision of the Acting Commissioner of Social Security, Carolyn W. Colvin ("Defendant") denying Plaintiff disability insurance benefits under Title II and XVI of the Social Security Act (the "Act"). After reviewing the Administrative Record, the Court finds that the Administrative Law Judge's ("ALJ") opinion was based on substantial evidence and, accordingly, affirms the decision.

**I.       FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Plaintiff was born on July 20, 1973, and was twenty-six years old on the alleged disability onset date of July 1, 2000. Administrative Record 39, 607 (hereinafter "A.R."). Plaintiff graduated from high school, and, prior to his alleged disability, worked as a customer service representative and a service clerk. A.R. 66, 607, 904-05.

This case has a long and protracted procedural history. On September 14, 2000, Plaintiff applied for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Act, alleging disability beginning on July 1, 2000. A.R. 57-59, 523-25. Plaintiff's

claims were denied initially and again upon reconsideration.  A.R. 11.  On August 8, 2001, Plaintiff requested a hearing, which was held on February 19, 2002 before Administrative Law Judge ("ALJ") Dennis O'Leary.   A.R. 11, 22-38.  ALJ O'Leary issued a decision on March 1, 2002, finding that Plaintiff was not disabled under the Act, and thus, denied Plaintiff's claims for disability insurance benefits and supplemental security income.  A.R. 11-17.  Plaintiff filed a timely Request for Review with the Appeals Council, which request was denied, making ALJ O'Leary's decision the final, reviewable decision of the Commissioner.  A.R. 5-7.  Plaintiff subsequently filed an appeal in the District Court for the District of New Jersey.  A.R. 595.  On July 16, 2003, the Honorable Faith S. Hochberg, U.S.D.J. signed a consent order, remanding the case for further administrative action.  A.R. 346-47.

On August 8, 2002, Plaintiff filed subsequent DIB and SSI applications, which were consolidated with his prior applications.  A.R. 595.  On February 19, 2004, ALJ O'Leary held another hearing in this matter, wherein Plaintiff, an independent medical expert, and a vocational expert testified.  A.R. 530-86.  ALJ O'Leary issued a decision on March 18, 2004, again finding that Plaintiff was not disabled under the Act.  A.R. 332-41.  Plaintiff filed a Request for Review with the Appeals Council on June 25, 2004, which request was denied on March 20, 2007.  A.R. 595.  Plaintiff appealed that decision to the District Court.  A.R. 595-96.  The Honorable Joel A. Pisano, U.S.D.J., signed a consent order remanding the case for further administrative action. A.R. 595-96.

By letter dated April 14, 2009, the Appeals Council vacated the ALJ's decision and remanded the case for further evaluation of Plaintiff's subjective complaints, as well as an explanation of the discrepancies in the treating and State agency medical consultant opinions. A.R. 596.  Following remand, a hearing was conducted before ALJ George C. Yatron on

September 13, 2010.  A.R. 834-64.  On October 14, 2010, ALJ Yatron issued a decision finding

that Plaintiff was not disabled under the Act.  A.R. 679-90.  Plaintiff filed a Request for Review,

and the Appeals Council granted Plaintiff's appeal and remanded the case for further

proceedings on February 28, 2011.  A.R. 596.

On April 9, 2012 and April 10, 2013, ALJ Daniel L. Rubini conducted additional

administrative hearings in this matter.  A.R. 867-944.  ALJ Rubini issued a decision on June 28,

2013, finding that Plaintiff was not disabled under the Act and denying his claims for DIB and

SSI.  A.R. 595-609.  On July 31, 2013, Plaintiff filed a statement of exception requesting review

with the Appeals Council, A.R. 610-13, which request was denied on March 6, 2015.  A.R. 587-

90.  On May 5, 2015, Plaintiff filed the instant appeal requesting review of the June 28, 2013

decision.

### A.      Plaintiff's Background and Work Experience

Plaintiff was twenty-six years old at the time of the alleged disability onset date, and thus,

is classified as a "younger individual," age eighteen to forty-nine, under the Commissioner's

regulations.  A.R. 607.  Plaintiff graduated high school in 1991, and is able to communicate in

English.  A.R. 66, 775, 904-05.   Plaintiff testified that he was last employed as a customer

service representative, a position that he held for two years before resigning in July 2000 because

he "felt sick all the time (with flu-like symptoms)" and experienced "constant fatigue and

difficulty concentrating."  A.R. 14, 775.

Plaintiff testified that he lives with his parents, and a typical day involves waking up

around 10:00 a.m., eating breakfast, taking a nap for a few hours, and watching television or

reading, before going to bed at approximately 11:00 p.m.  A.R. 14.  Plaintiff is able to drive

locally, leaves the house once per month to attend church with his parents, and a few times a year to go shopping or visit friends.  A.R. 14.

**B.     Review of the Medical Evidence**

*1.     Plaintiff's Treatment Regimen*

Plaintiff testified that he was first diagnosed with HIV when he was eighteen years old, and that he received no treatment for that condition until he started a treatment regimen with Paul Bellman, M.D., in August 2000.  A.R. 14.  By that time, Plaintiff also suffered from Hepatitis B and anal warts.  A.R. 137.  During Plaintiff's initial follow up visit with Dr. Bellman, he noted no symptoms other than significant lymphadenopathy.  A.R. 142.  Following a physical examination of Plaintiff, Dr. Bellman found that Plaintiff did not have any "abnormalities in [his] general appearance," and appeared "well developed" and "well nourished."  A.R. 142.  Dr. Bellman prescribed Plaintiff the following medications and antiretroviral therapy ("ART"): Sustiva, Combavir, Agenerase, and Rescriptor, as well as Famvir and Epivir to treat Hepatitis B.  A.R. 142-43.  At the end of Plaintiff's first month of treatment, Dr. Bellman noted that Plaintiff was tolerating his medications, except for an initial adverse reaction to Sustiva.  A.R. 140-41.

During a follow up visit on October 2, 2000, Dr. Bellman found that there was a dramatic drop in Plaintiff's viral load after just sixteen days of therapy.  A.R. 139.  Plaintiff complained of "some difficulty sleeping" and still exhibited signs of lymphadenopathy, but otherwise reported that he felt "okay."  A.R. 139.  As a result, Dr. Bellman continued Plaintiff's medication regimen.  A.R. 139.

On October 10, 2000, Dr. Bellman completed an Internal Medicine Report regarding Plaintiff for submission to the Social Security Administration.  A.R. 187-91.  In response to question thirteen of that Report, which asked the physician for his opinion about the claimant's

ability, "despite the functional limitations imposed by the [claimant's] impairment(s), to do work related physical activities (such as sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking, and traveling)," Dr. Bellman indicated that Plaintiff was "disabled due to AIDS." A.R. 190.

Plaintiff visited Dr. Bellman on at least a bi-weekly basis through November 2000, during which time Dr. Bellman continued Plaintiff on his medication. A.R. 135-138. Dr. Bellman reported that Plaintiff was "feeling well," and that his viral load continued to drop. A.R. 135. Specifically, on November 16, 2000, Dr. Bellman indicated that Plaintiff's T-cells/CD4 were above 300, and that Plaintiff's viral load continued to drop at 270. A.R. 135. However, Plaintiff complained of pain from areas of anal warts, and continued to demonstrate signs of lymphadenopathy. A.R. 137. Dr. Bellman directed Plaintiff to undergo surgery for anal warts. A.R. 135.

On December 7, 2000, Dr. Bellman indicated that Plaintiff reported relief following anal wart surgery, and noted that Plaintiff's liver function remained "stable." A.R. 134. Additionally, Dr. Bellman reported that Plaintiff's viral load continued to decrease, that his T-cells/CD4 were improving, and that Plaintiff did not exhibit any significant toxicity. A.R. 134.

Dr. Bellman continued to report positive results through February of 2001. In that regard, Dr. Bellman reported that Plaintiff was "generally doing well," and that his last laboratory results were "excellent," with an undetectable viral load and T-cells/CD4 above 300. A.R. 222-23. Nonetheless, Dr. Bellman noted that Plaintiff was getting recurrent treatment for anal warts, and exhibited dietary issues and increased cholesterol, which may have been attributable to Sustiva. A.R. 222. Additionally, on January 18, 2001, Dr. Bellman submitted a supplement to his October 10, 2000 Internal Medicine Report to the Social Security

Administration, responding to a question asking him to indicate any "functional loss that would interfere with [Plaintiff's] work activity" by stating that Plaintiff suffered from "fatigue" and "depression." A.R. 133.

During several follow up visits in March 2001, Dr. Bellman reported that Plaintiff's laboratory results showed elevated liver enzymes of unclear etiology, which he opined was likely due to a combination of Hepatitis B and HIV medications. A.R. 218-221. Plaintiff did admit to drinking small amounts of alcohol on occasion, which Dr. Bellman advised him to discontinue completely. A.R. 220. Otherwise, Dr. Bellman noted that Plaintiff was responding "extremely well" in terms of his HIV, with an undetectable viral load. A.R. 220-21. Given the rise in liver functions, however, Dr. Bellman temporarily halted Plaintiff's HIV medications on March 27, 2001. A.R. 216-18.

On April 30, 2001, following approximately one month of being off HIV medications, Plaintiff reported swollen lymph nodes and increased fatigue. A.R. 215. On May 3, 2001, Dr. Bellman reported that Plaintiff's liver functions had "dramatically improved," most likely due to the discontinuation of his antiviral medications. A.R. 214. Dr. Bellman restarted Plaintiff's HIV medications, substituting AZT for Zerit, and, in May and June of 2001, Plaintiff reported feeling "much better" since restarting his medications, with decreased swelling in his lymph nodes and stable liver functions. A.R. 213-15.

In July 2001, Dr. Bellman reported that Plaintiff's laboratory results showed anemia, which was most likely attributable to AZT. A.R. 210-11. Dr. Bellman added Epogen to Plaintiff's medications to combat the anemia. A.R. 211. Dr. Bellman indicated further that Plaintiff was generally feeling well, although Plaintiff reported feeling "a little tired." A.R. 210-

11. Plaintiff's T-cells/CD4 were in the mid-200 range, and Dr. Bellman recommended that

Plaintiff continue with his regimen. A.R. 210-11.

On January 16, 2002, Dr. Bellman submitted the following statement regarding Plaintiff's

condition:

> Mr. Joseph Brando has asked me to dictate a short note in support of his disability as his attending physician. I have taken care of Mr. Brando since August 8, 2000. Mr. Brando is under my care for AIDS and multiple complications of AIDS including anemia, neutropenia, recurrent infections, depression and chronic Hepatitis B. Mr. Brando's condition remains serious. He requires weekly injections with growth factors to maintain his white and red cells at a safe range and requires frequent monitoring for toxicity and the determination of the efficacy of his medications. In my opinion, he remains completely disabled.

A.R. 283.

On September 6, 2002, Jack Baharlias, Ed.D., performed a psychological consultative

examination of Plaintiff at the request of the State. A.R. 485-87. Following a series of cognitive

tests, Dr. Baharlias made the following observations in his examination notes:

> Mr. Joseph Brando is a 29 year old young man, who is appropriately dressed with jeans and a short sleeved shirt and he has brown hair. The mental status interview, as requested by the Division of Disability Determinations, began with a brief cognitive screening on the information and orientation subtest of the Wechsler Memory Scale to which the claimant answered all questions correctly, except he was unaware of the name of the town in which the examiner's office was located. On the mental control subtest, this claimant was able to count backwards from 20 to 1 and recite the alphabet but he was not able to do a 3 step mathematical activity. When given serial 7's, he was able to verbalize only the first declination and made an error after that. When asked to spell the word, "World", he was able to spell it forward and backwards. On digit span subtest, the claimant was able to remember 7 numbers forward, which is above average, and 4 numbers backwards, which is somewhat below average, thus indicating that his immediate memory for numbers is adequate, while his concentration and active working memory may be slightly impaired.

A.R. 486-87.

Dr. Baharlias noted further that Plaintiff was "not experiencing any pain on the day of the

evaluation, but that he is subject to getting headaches, stomach aches, colds, and is always under

the weather . . . as he is vulnerable to infections due to his HIV condition." A.R. 487. Dr.

Baharlias continued:

> The claimant's posture and gait were unremarkable. There were no involuntary movements and he was quite cooperative during the interview. The claimant indicated that he was never an IV drug user. He had, on occasion, smoked marijuana and had, in the past, used alcohol but not excessively.
>
> The claimant denied paranoid ideation, and suicidal as well as homicidal ideation. The claimant, however, indicated that, sometimes, he feels like not taking his medicine, and that would be tantamount to hastening his ill health development.
>
> The claimant's thought process was felt, by this examiner, to be essentially logical. He, however, indicated that he frequently feels confused. He acknowledged flight of ideas, and having difficulty concentrating on any one thing.
>
> The claimant's eye contact was satisfactory. He was well oriented in all 3 spheres, and his mood was obviously depressed. The claimant was neither lethargic nor agitated, nor was he spontaneous. When he did speak, it was with adequate volume and adequate rate. He was goal directed and there was no evidence of a thought disorder or tangential or circumstantial conversation. When asked what makes him happy, he indicated that he does not get happy or excited about anything at this time, but that he used to enjoy going to amusement park rides, and that he feels limited at this time.

A.R. 487. Dr. Baharlias also indicated that Plaintiff's behavior was "essentially appropriate,"

and that while Plaintiff was concerned about his health, he was not suffering from auditory or

visual hallucinations, obsessive thoughts, or compulsive behavior. A.R. 487-88. In his closing

remarks, Dr. Baharlias attested to the following:

> The examiner felt that, overall, the claimant's insight and judgment were fair. If the claimant is found eligible for funding, I believe that he is capable of managing his funds on his own at the present time. The diagnosis which most closely approximates this claimant's functioning, in this examiner's opinion, would be as follows:
>
> > Axis I: Adjustment disorder, with depressed mood, sometimes rising to the level of a dysthymic disorder, secondary to HIV status.
> >
> > Axis II: There is a possibility that he has a cognitive disorder, not otherwise specified, as related to his HIV condition, although I do not see any specific signs at this time, of a significant impairment or what is called the HIV cognitive motor complex, although a further evaluation on cognitive tests and memory tests may be in order at the discretion of the Division of Disability Determinations.

Axis III:  HIV and other related illnesses.

A.R. 488.

On September 30, 2002, Vinod K. Sinha, M.D., examined Plaintiff at the request of the State agency.  A.R. 489-91.  Dr. Sinha began by assessing Plaintiff's work history.  A.R. 489. Dr. Sinha found that while Plaintiff has previously worked as a customer service representative, he stopped working in July 2000 after experiencing "symptoms of frequent respiratory infection, fatigue, tiredness and flu-like symptoms."  A.R. 489.  Dr. Sinha noted that Plaintiff had indicated that those symptoms still persisted, but were "less intense than before."  A.R. 489.  Dr. Sinha explained that Plaintiff's "other problem is feeling of anxiety, depression, and tiredness and he feels that the medication makes him lose sleep at night."  A.R. 489.

Dr. Sinha also performed a physical examination of Plaintiff, and made the following remarks in his examination notes:

> On physical examination Mr. Brando is a 29-year-old Caucasian male. He is 69 inches tall and weighs 161 pounds. He is alert, cheerful, ambulatory, well nourished, and well built, not in any distress. Pupils are equal and reacting to light and accommodation. Vision in the right eye is 20/25 with contact lenses. Vision in the left eye is 20/25 with contact lenses. ENT examination is normal. No evidence of jaundice, cyanosis, clubbing, lymph node enlargement, or pitting edema of the legs are noted. Thyroid gland is not enlarged. Neck veins are not engorged.

A.R. 490.  Dr. Sinha concluded the examination with the following assessment:

> Mr. Brando is a 29-year-old, well-nourished, well-built, Caucasian male who has history of infection with human immune deficiency virus, on treatment, and at this time he has clinical signs and symptoms of reactive anxiety and mild depression.

A.R. 491.

On March 7, 2003, after not having visiting a treating physician since November 2002, Plaintiff sought treatment from Ricky Hsu, M.D.  A.R. 393-94.  Following a physical examination, Dr. Hsu noted "no abnormalities" in Plaintiff's general physical appearance,

indicating that Plaintiff appeared "well developed" and "well nourished," with stable vital signs. A.R. 393. However, Dr. Hsu did document mild lymphadenopathy, as well as the fact that Plaintiff had difficulty sleeping due to taking Sustiva. A.R. 393. Dr. Hsu continued Plaintiff on his medication regimen. A.R. 394.

During a follow up visit on March 21, 2003, Dr. Hsu indicated that Plaintiff felt "very tired," had "[n]o sex drive," and experienced increased fatigue over the last few weeks. A.R. 391. In June and July of 2003, Dr. Hsu reported that "[e]verything [was] going well" and Plaintiff was not exhibiting any physical abnormalities, although Plaintiff reported feeling depressed and isolated. A.R. 387-89. Dr. Hsu noted that Plaintiff was occasionally smoking marijuana, and that the doctor may consider placing Plaintiff on Lexepro after receiving Plaintiff's bloodwork results. A.R. 389-90.

On August 13, 2003, Dr. Hsu examined Plaintiff and reported "concern" over the fact that Plaintiff had lost ten pounds since his last visit. A.R. 413. Dr. Hsu indicated that Plaintiff "had lowest T cell count around 100," and Plaintiff's "[m]ood still fluctuates a fair amount." A.R. 413. However, during a follow up visit on October 14, 2003, Dr. Hsu reported that Plaintiff's mood had improved since using Lexepro, and that Plaintiff appeared to be "more focused." A.R. 411.

On July 13, 2006, Plaintiff began treatment at the Lehigh Valley Hospital and Health Network AIDS Activity Office (the "AAO"). A.R. 761. During his initial visit, Plaintiff's only complaints were depression, which related in part to his living situation, and "mild" interruption of his sleep cycle. A.R. 761. With regard to HIV treatment, Plaintiff reported that he had been on a regimen of AZT, 3TC, and efavirenz for several years "without any significant side effects." A.R. 761. Plaintiff also underwent a physical examination under the direction of Joseph

Yozviak, D.O.  A.R. 762.  Dr. Yozviak reported that Plaintiff's viral load was "undetectable with a good CD4 responsive to current regimen of Combivir and efavirenz."  A.R. 763.  However, Dr. Yozviak noted a possible medication adjustment to "Truvada, efavirenz, or possible Atripla for the sake of convenient dosing and also to add tenofovir to his regimen for treatment of active hepatitis B."  A.R. 763.  Because Plaintiff experienced "elevated transaminases" after taking Lexapro, Dr. Yozviak discontinued Plaintiff on Lexapro, and prescribed him a low dose of Zoloft as an alternative to treat depression.  A.R. 763.

On August 3, 2006, Plaintiff had a follow up appointment at the AAO, and reported that his depression and mood had improved since he started taking Zoloft.  A.R. 752.  Plaintiff's sleep pattern improved, and he reported rising at a "reasonable hour in the morning."  A.R. 752.  Additionally, at the time of the visit, Plaintiff had a viral upper respiratory infection, with "[s]ymptoms of a cough and myalgias."  A.R. 753.  Plaintiff continued to take Combivir and efavirenz without side effects, and Dr. Yozviak increased Zoloft and, again, started Plaintiff on tenofovir to treat Hepatitis B.  A.R. 753.

On September 18, 2006, Plaintiff visited the AAO for a regular visit, and reported discontinuing Zoloft approximately two weeks prior, after reading about its side effects on the Internet.  A.R. 743.  Plaintiff indicated that symptoms of depression had returned since discontinuing Zoloft, and that he was having trouble sleeping with nightmares, "probably related to Sustiva use."  A.R. 743.  Plaintiff indicated that he had "problems with energy in the morning," feeling lethargic and like he did not want to get out of bed, and reported rectal pain and blood after bowel movements.  A.R. 743.  Plaintiff was examined by Paul Layden, M.D., who indicated that Plaintiff was "in no apparent distress," and was "alert," "oriented," "very interactive," and in "very good mood and affect."  A.R. 743.  Dr. Layden prescribed a low dose

of Lexapro to treat Plaintiff's depression, and changed his HIV therapy from Sustiva Truvada to Atripla daily.  A.R. 744.

On November 13, 2006, Darren C. Aboyoun, Ph.D., performed a psychological consultative examination of Plaintiff on behalf of the State agency.  A.R. 775-777.  During that visit, Plaintiff stated that he was "unable to function in a vocational position due to his frequent illnesses, side effects from this medication, and concentration impairments."  A.R. 775.  Dr. Aboyoun described Plaintiff's medical history as "significant for several hospitalizations," including being hospitalized for pneumonia and medical testing related to his HIV.  A.R. 775. Dr. Aboyoun reported that Plaintiff had been diagnosed with HIV in 1993 and Hepatitis B in 2001, and was currently taking Lexapro and Atripla.  A.R. 775.  Dr. Aboyoun made the following observations regarding Plaintiff's mental status:

> The claimant described his mood as being depressed. He reported experiencing symptoms of hopelessness, helplessness, and worthlessness. He stated that his depressed mood has persisted every day for at least two weeks. The claimant reported experiencing anhedonia. The claimant reported experiencing passive suicidal ideation, but denied having any suicidal intent or plan. No history of suicide attempts was reported. No history of manic behavior was reported. The claimant indicated that he has experienced intermittent panic attacks that occur approximately once per week. His panic symptoms include feelings of fearfulness, increased heart rate, increased breathing, concentration problems, and an increase in perspiration. The claimant reported that he typically sleeps approximately four to six hours per night. He reported having difficulties remaining asleep. The claimant noted that he naps for approximately four hours per day. He described his appetite as being poor, but was uncertain about experiencing recent weight change. The claimant described his energy level as being decreased. He reported experiencing significant problems with recent and remote memory as well as concentration. The claimant denied engaging in current illicit drug or alcohol use. He denied having any history of illicit drug use or prescription drug abuse. He denied having any history of intravenous drug use. The claimant's history is significant for intermittent bouts of alcohol abuse that occurred in the 1990s. The claimant's thought process was coherent and goal directed with no evidence of hallucinations or delusions. His affect was of full range and appropriate in speech and thought content. He was oriented to person, place, and time. He was able to count to ten. He was able to complete simple calculations accurately (e.g., 7*3, 17+ 12, 30/6). He was able to complete serial threes from 20 to two without any errors. He was able to recall three of three objects immediately and two of three objects after a five-minute delay. He was able to recall up to seven digits forward

and five digits backward. His insight and judgment were fair. His estimated intelligence is in the average range.

A.R. 775-76.

In regards to Plaintiff's behavior, Dr. Aboyoun observed that Plaintiff was "cooperative throughout the evaluation," dressed neatly and casually, was well groomed, maintained appropriate eye contact, and had a normal gait. A.R. 776. Additionally, Dr. Aboyoun indicated that Plaintiff "appeared younger than his stated age," spoke fluently and clearly, and was expressive and receptive. A.R. 776. Dr. Aboyoun also made the following observations regarding Plaintiff's daily activities:

> The claimant indicated that he typically awakens between 9 and 10 am. After he awakens, he either talks with his parents or with his friends. The claimant stated that he typically skips breakfast, watches television, and uses the computer in the morning. In the afternoon, the claimant reportedly prepares a simple meal for himself. He stated that he returns to bed to nap between 12 and 4pm. The claimant indicated that he sometimes grooms himself upon awakening from his nap. After napping, the claimant typically eats dinner with his family. He noted that he spends the evening visiting with friends. He reported that he typically retires between 11 pm and 1 am. The claimant indicated that he does not do any household chores consistently. He noted that he is financially dependent upon his parents and that he does not have any source of income. He denied having any problems with money management.

A.R. 776. Dr. Aboyoun continued:

> The claimant is able to follow and understand simple directions. He is able to perform simple tasks independently or with supervision. He has a limited ability to maintain attention and concentration. He may have some difficulty with maintaining a regular schedule. He is able to learn new tasks. His ability to perform complex tasks independently is limited. His ability to make appropriate decisions is limited. He is able to relate adequately to others. His ability to appropriately deal with stress is limited.

A.R. 776. In closing, Dr. Aboyoun recommended that Plaintiff seek counseling to address his depression, but noted that Plaintiff had a "good" prognosis with appropriate treatment, and would "be able to manage any funds that he is awarded." A.R. 776-77.

On January 21, 2008, Plaintiff returned to the AAO and was examined by Dr. Yozviak.

A.R. 827-29. According to Dr. Yozviak's report, Plaintiff noted compliance with his medications, and denied any side effects including fatigue, night sweats, weight loss, and headaches. A.R. 827. Dr. Yozviak documented a normal physical examination, except for a plantar wart on Plaintiff's right foot, which Plaintiff indicated was causing him discomfort, and for which he was referred to a dermatologist. A.R. 829-30. Plaintiff reported that he exercised three times per week, consisting of cardio and weight lifting. A.R. 827. Dr. Yozviak refilled Plaintiff's ART therapy, noting he was "tolerating current antiretroviral therapy and immunologic response." A.R. 829. Dr. Yozviak also noted that Plaintiff's Hepatitis B was suppressed on Truvada, and that his weight was stable. A.R. 830. Dr. Yozviak indicated that Plaintiff was "[a]lert and cooperative," and exhibited a normal mood, attention span, and concentration. A.R. 829.

Plaintiff had a follow up appointment with Dr. Yozviak on June 23, 2008, at which time he reported general medication compliance with no side effects. A.R. 819-23. Plaintiff alerted Dr. Yozviak to right shouldler pain that Plaintiff had suffered as a result of an exercise-induced injury a few months earlier. A.R. 819. However, Plaintiff noted that he had rested his shoulder over the past few weeks with some improvement. A.R. 819. A physical examination of Plaintiff's shoulder revealed a full range of motion, with tenderness to palpation of the right AC joint. A.R. 822. The remainder of Plaintiff's physical examination was normal. A.R. 822. Dr. Yozviak indicated that Plaintiff's viral load continued to rise, despite "excellent adherence" to his medication regime, and thus, noted that Plaintiff's medication would be monitored and might require adjustment. A.R. 822. Dr. Yozviak also recommended that Plaintiff "return to work as soon as possible to ensure financial stability later in life and also improve mood and outlook." A.R. 822.

In follow up examinations with Dr. Yozviak in August and September of 2008, Dr. Yozviak noted that Plaintiff had complied with his medications without side effects. A.R. 813, 815. During the August 12, 2008 visit, Plaintiff indicated that his shoulder pain had persisted, despite a cortisone injection, A.R. 813, and complained of urinary frequency and diarrhea. A.R. 814. During the September 11, 2008 visit, Plaintiff reported urinary frequency without fever, dysuria, and fatigue. A.R. 815. Plaintiff had no other complaints, and Dr. Yozviak continued Plaintiff's medication and noted that he would recheck Plaintiff's viral load. A.R. 828.

### 2. State Agency Assessments

On October 29, 2002, A.M. Pirone, M.D., a State agency physician, reviewed Plaintiff's medical records and rendered an opinion as to Plaintiff's functional capacity. A.R. 495-513. In that regard, Dr. Pirone noted that Plaintiff could occasionally lift up to fifty pounds, frequently lift up to twenty-five pounds, stand and/or walk (with normal breaks) for a total of approximately six hours in an eight-hour workday, sit (with normal breaks) for a total of about six hours in an eight-hour workday, and can push and/or pull objects. A.R. 496. In reaching those conclusions, Dr. Pirone explained that Plaintiff was a twenty-nine-year-old man alleging disability because of HIV, Hepatitis B, and anemia, who had stated that his medications caused fatigue, but had not had any hospitalizations, had no abdominal symptoms, and maintained a stable weight with a healthy appetite. A.R. 496. Dr. Pirone did not note any ostural limitations, manipulative limitations, visual limitations, communicative limitations, or environmental limitations. A.R. 497-99.

Plaintiff was also evaluated in October 2002 by D. Fugate, Ph.D. a State agency psychologist. A.R. 503-18. In evaluating Plaintiff's mental residual functional capacity over a normal workday and workweek, Dr. Fugate noted that Plaintiff was not significantly limited in

the following areas: remembering locations and work-like procedures; understanding and remembering very short and simple instructions; carrying out very short and simple instructions; performing activities within a schedule, maintaining regular attendance, and being punctual; sustaining an ordinary routine without special supervision; working in coordination with or in proximity to others without being distracted; making simple work-related decisions; asking simple questions or requesting assistance; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; being aware of hazards and taking appropriate precautions; traveling in unfamiliar places or using public transportation; and setting realistic goals or making plans indecently of others. A.R. 503-504. Dr. Fugate noted that Plaintiff was moderately limited in the following areas: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; and the ability to respond appropriately to changes in the work setting. A.R. 503-504. Dr. Fugate rated Plaintiff's functional limitations as follows: mild restriction of activities of daily living; moderate difficulty maintaining social functioning; moderate difficulty maintaining concentration, persistence, and pace; and no episodes of extended periods of compensation. A.R. 517. Dr. Fugate concluded that Plaintiff "appears capable of performing simple, repetitive, work-related tasks." A.R. 505.

On December 12, 2006, Frances E. Hecker, a State agency psychologist, reviewed Plaintiff's records and examined Plaintiff. A.R. 778-95. Dr. Hecker found that Plaintiff suffered

from major depressive disorder and panic disorder. A.R. 781-83. Dr. Hecker also rated Plaintiff's functional limitations as follows: moderate restriction of activities of daily living; mild difficulty in maintaining social functioning; moderate difficulty in maintaining concentration, persistence, or pace; and no extended episodes of decompensation. A.R. 788. In regards to Plaintiff's functional capacity, Dr. Hecker found that Plaintiff demonstrated a depressed mood, anhedonia, passive suicidal ideation without intent, poor sleep and appetite, low energy intermittent panic attacks, and adequate memory and concentration. A.R. 794. Dr. Hecker concluded that, "from a pysch perspective, [Plaintiff] is able to maintain pace, persistence and concentration in simple routine tasks," and was "able to relate appropriately to coworkers and the public." A.R. 794.

### C. Review of Testimonial Record

On April 9, 2012 ALJ Rubini held a hearing in Plaintiff's case, at which time Plaintiff and vocational expert Sherry L. Kristal Turetzky ("VE Turetzky") testified. A.R. 869. For the sake of completeness, this section will also examine prior testimony given in this case.

#### 1. Plaintiff's Testimony

Plaintiff testified that he was thirty-eight years old at the time of the hearing, and that he was single with no children. A.R. 869. Plaintiff stated that he had completed high school, and, upon graduation, attended a technical school for a year to pursue a career in the music industry. A.R. 880-82. Plaintiff testified that he had an active driver's license, but that his parents drove him to the hearing, and that he only drives locally due to an inability to concentrate on the road. A.R. 870-71. In that regard, Plaintiff explained that he would not have driven to the hearing unless it was an emergency. A.R. 872. Additionally, Plaintiff stated that his inability to

concentrate extends beyond driving, as he often forgets tasks that people ask him to perform. A.R. 873.

In terms of his alleged disability, Plaintiff testified that he had contracted HIV approximately twenty years prior to the date of the hearing, and that he consumes various medications, including Atripla, which cause serious side effects. A.R. 871. In particular, Plaintiff testified that Atripla causes hallucinatory dreams and thoughts, depression, and nausea, and prevents him from sleeping well. A.R. 871-72. Plaintiff explained his condition as follows: "And I feel, the only way I could describe it is I feel most of the time like I have the flu. So I feel sick more often than not. And I'm tired during the day because the medicine that I take causes nightmares, so I don't sleep very good at night." A.R. 872. Plaintiff stated that he feels fatigued during the day, with flu-like symptoms, including congestion, headaches, diarrhea, nausea, stomach aches, and tiredness. A.R. 872. He also testified to having muscle aches and pains throughout his body. A.R. 872.

When prompted to recount the symptoms that he experiences on a daily basis, Plaintiff explained, "I feel exhausted all the time, tired, headaches, stomach aches, nausea, diarrhea, anxiety, depression. My body hurts, so I don't know if you'd call that, you know, muscle or bone or whatever." A.R. 896. Plaintiff also cited a need to use the bathroom frequently, *i.e.,* approximately once per hour and several times at night. A.R. 896. Plaintiff stated that he feels uncomfortable leaving his house because he has frequent "bathroom accidents." A.R. 900. Plaintiff reported that he often feels pain in his legs and lower back, and explained that he would not be able to stand or walk for three or four hours a day, even with breaks. A.R. 896-97. Plaintiff also explained feeling discomfort while sitting. A.R. 897.

Plaintiff testified that he last worked as a customer service representative in 2000, performing data entry, communicating over the telephone and through a facsimile machine, conducting routine office tasks, and handling products in the warehouse. A.R. 873-75. Plaintiff's duties consisted primarily of sitting, but the warehouse operations required him to stand and lift packages weighing twenty-five to forty pounds. A.R. 875. Plaintiff testified that prior to stopping work, he began experiencing many of the symptoms that he indicated he was suffering from at the time of the hearing, which caused him difficulty at work. A.R. 876. Plaintiff testified that he began making mistakes at work, and was showing up late or missing days of work because he felt ill. A.R. 876-77.

Plaintiff explained that since he stopped working in 2000, he has lived with his parents, who pay for his food, bills, and transportation. A.R. 879. Plaintiff does not pay rent to his parents. A.R. 879-80. Plaintiff explained that he receives food stamps, which he gives to his parents. A.R. 879-80. Plaintiff testified that he experiences anxiety when he leaves his home, and thus, does not like to do so. A.R. 888. Plaintiff indicated that he does attend church with his family, approximately once per month. A.R. 890-91. Plaintiff also stated that he sees one of his friends four to five times per year, and speaks to several others on the phone. A.R. 891-92.

Plaintiff stated that he uses a home computer, typically to read the news. A.R. 892. He explained that he does not assist his parents with any housework, cooking, laundry, or yard work, and does not do any household shopping. A.R. 892-93. Plaintiff testified that he no longer reads books, because he is unable to recall what he has read after finishing a page. A.R. 898. Plaintiff stated that his last romantic interest occurred more than ten years prior to the hearing. A.R. 901.

### 2. *Testimony of the Vocational Experts*

Sherry L. Kristal Turetzky testified as the vocational expert ("VE Turetzky") at the hearings held before ALJ Rubini on April 9, 2012 and April 10, 2013. A.R. 901, 915-944. VE Turetzky placed Plaintiff's prior work experience under several different classifications. First, VE Turetzky testified that Plaintiff's former job as a customer service representative, engaging with customers over the phone and through the computer, is a "semi-skilled," "sedentary" position, associated with DOT 249.362-026. A.R. 904. Second, VE Turetzky classified Plaintiff's experience working in the warehouse as a store laborer as a "medium" and "unskilled" position, associated with DOT 922.687-058. A.R. 904. Third, VE Turetzky classified Plaintiff's work experience as a waiter as "entry-level semi-skilled," corresponding to DOT 311.477-030, because Plaintiff was required to lift up to fifty pounds, *i.e.*, a "medium exertional level." A.R. 904. Finally, VE Turetzky testified that Plaintiff's experience as a counter attendant at a coffee shop was a "light" and "unskilled" position, associated with DOT 311.477-014. A.R. 904-05.

VE Turetzky was asked several hypotheticals, based on Plaintiffs functional limitations, and concluded that Plaintiff could perform the following unskilled jobs, involving medium, light, or sedentary work, which exist in significant numbers in the national economy: industrial sweeper and cleaner, DOT 389.683-010 (1,000,000 of these medium exertion jobs exist nationally, with 2,000 existing regionally); laundry laborer, DOT 381.687-018 (medium-exertion; 100,000 nationally; 1,000 regionally); cleaner and housekeeping, DOT 323.687-014 (medium-exertion; 200,000 nationally; 500 regionally); grinder operator, DOT 603.685-058 (light-exertion; 70,000 nationally; 200 regionally); and cable worker, DOT 739.687-182 (sedentary-exertion; 50,000 nationally; 200 regionally). A.R. 906-11.

VE Turetzky continued her testimony on April 10, 2013. A.R. 915-944. In responding to various hypotheticals regarding a person's ability to "maintain a regular schedule", VE Turetzky

explained that "the maximum tolerance for absenteeism is typically no more than one day per month," and thus, a person who would miss more than one day per month is typically unable to "sustain work over the long run." A.R. 919. In terms of maintaining concentration and attention, VE Turetzky explained that a person whose attention lapses occasionally can perform "simple, routine, repetitive unskilled work." A.R. 921. By contrast, in regards to more frequent lapses in attention, VE Turetzky explained as follows:

> If it starts exceeding, if one is – if it's framed in terms of being off task more than say 10, 12, 15 percent of the time, you wouldn't be able to keep up with productivity expectations. That's a -- that is an important factor for keeping a job. If you're not able t keep up with productivity expectations because you're just-- your mind is wandering that much, you're off task for whatever reason, pain, emotions, whatever, you're not going to be able to keep up with the job and you're not going to be able to keep the job. You could be making too many mistakes. You'll be missing too much.

A.R. 921-22. Indeed, VE Turetzky testified that person who is "off task" more than ten percent on a sustained basis would not be able to sustain a job. A.R. 922. Thus, in summary, VE Turetzky testified that a person who was either off task more than ten percent of the time, or missed more than one day of work per month, would not be able to sustain any type of job. A.R. 927-28.

Additionally, prior to the most recent hearings before ALJ Rubini, two other vocational experts have testified in Plaintiff's case before other ALJs. First, on February 19, 2004, vocational expert Rocco Meola ("VE Meola") classified Plaintiff's former job, as a customer service representative, as unskilled "sedentary work," involving some walking. A.R. 577.

VE Meola was provided with a hypothetical scenario of a person who was restricted to sedentary work, and had a mild restriction and fatigue that would affect the person's ability to maintain concentration and persistence of pace. A.R. 578. VE Meola opined that there would be jobs available for such a person, including talking to customers and taking orders over the phone,

including jobs as a "ticketer," "parts sorter," [or] "order clerk." A.R. 578. Regionally, VE Meola opined that aggregate number of such jobs ranged between 17 and 1,700, with 30,000 jobs existing on a national basis. A.R. 578. VE Meola opined that even if the hypothetical person's restriction was upgraded from mild to moderate,[1] due to fatigue and ability to maintain concentration and persistence of pace, that person could perform those same jobs. A.R. 578.

Second, on September 13, 2010, vocational expert Richard J. Baine ("VE Baine"), testified at the hearing before ALJ George C. Yatron. A.R. 848-866. VE Baine classified Plaintiff's prior work experience as both a customer service representative and a waiter as "light," "semi-skilled," associated with DOT 239.362-014, based on the fact that Plaintiff had to perform data entry, packing, and shipping, as well as controlling supplies. A.R. 848-49.

ALJ Yatron then posed the following hypothetical to VE Baine:

I would like you to consider hypothetically an individual 37 years of age, with training, education, and experience as in the present case, who is able to lift 20 pounds, stand and walk six hours in an eight hour day, sit for six or more eight hours in an eight hour day. Nonexertional limitation, no detailed instructions. Given those facts and circumstances, is there any work the hypothetical individual could perform on a sustained basis, including the past work of the Claimant.

A.R. 849-50. VE Baine responded as follows:

Based on the limitation of no detailed work, I would be of the opinion that this gentleman would not be able to perform either of his past work activities, including the waitering activities, because although it's listed as a vocational preparation of three, a waiter is responsible for taking care of many customers, keeping orders straight, and in some cases taking change, or monies, or credit cards, making sure things are accurate. I think those types of activities would be not warranted for someone with the hypothetical that is given. However, there are light duty unskilled work activities that would be appropriate, including those of being a packer. And I'm using numbers for the Allentown-Bethlehem-Easton labor market because the Phillipsburg, New Jersey area is considered part of that area geographically. And for packers in the Allentown area you have 1200 packers, light duty, unskilled, 300,000 nationally. He would be able to do a position such as a, unskilled

---

[1] The VE explained that a "moderate" restriction is defined as someone working at 60 to 65 percent of the rate of a typical worker. A.R. 579. By contrast, someone with a "mild" restriction is restricted 10 to 15 percent of the time. A.R. 579.

inspectors. In the Allentown region, there's 1,000, 289,000 nationally. And there would be unskilled work activities such as attendants. And in the Allentown region there's 1800, 300,000 nationally.

A.R. 850-51. VE Baine testified further that his testimony was consistent with the Dictionary of Occupational Titles. A.R. 851.

VE Baine also testified as to the requisite ability to maintain attention, persistence, and pace in the light-work, unskilled jobs that he outlined for ALJ Yatron. A.R. 855. In that regard, VE Baine stated that an individual who had a moderate limitation in maintaining attention, for fifteen minutes each hour, would be unable to meet the production standard, and thus, would be unemployable in such a position. A.R. 856. Additionally, VE Baine testified that an individual who had a moderate limitation in his ability to complete a normal work day or work week without interruptions from psychologically based symptoms, or to perform at a persistent pace without an unreasonable number and length of rest periods, would be at risk for maintaining employment with those types of restrictions." A.R. 858-59. However, VE Baine noted that such a person's capability to work is ultimately the ALJ's determination. A.R. 859.

### 3. Medical Expert Testimony

Dr. Martin Fethsner testified as an independent medical expert at the hearing held before ALJ O'Leary on February 19, 2004. A.R. 555. Dr. Fethsner testified that Plaintiff was a thirty-year-old man who had been HIV positive since 1992, and has had anemia in the past. A.R. 555-56. However, Dr. Fethsner stated that Plaintiff had been taking Epogen to treat the anemia, which had kept it "under control very nicely." A.R. 556.

Dr. Fethsner noted that Plaintiff's medical records seemed to contradict his statements as to suffering from diarrhea and night sweats, as neither of those symptoms had been marked in his physician visits. A.R. 556. Dr. Fethsner confirmed that Plaintiff's weight had fallen below 140

pounds in October of 2000, reaching a low of 134 pounds. A.R. 556. Subsequently, Plaintiff

was placed on medication and his weight went up. A.R. 556. Dr. Fethsner indicated that

Plaintiff's most recent weight, taken in October of 2003, was 159 pounds. A.R. 557. Dr.

Fethsner testified that Plaintiff exhibited "no evidence" of a major opportunistic infection in the

past, but that Plaintiff was positive for Hepatitis B. A.R. 557.

In terms of Plaintiff's residual functional capacity, Dr. Fethsner opined that, taking into

account Plaintiff's anemia, white blood cell count, and CD4 count, as well as the general

weakness that would occur given Plaintiff's condition, Plaintiff "would be limited to sedentary

activity at this point." A.R. 557-58. Dr. Fethsner testified that Plaintiff could experience

tiredness and fatigue as a result of his medication regime, but that he considered these factors in

rendering his opinion as to Plaintiff's residual functional capacity. A.R. 558-60. Dr. Fethsner

testified further that the average person taking Plaintiff's medications would be able to perform

sedentary work. A.R. 566. Dr. Fethsner stated that he disagreed with Dr. Bellman's opinion that

Plaintiff was "disabled as far as Social Security criteria." A.R. 575.

### 4. *Affidavit of Shirley Brando*

On May 1, 2002, Shirley Brando, the mother of Plaintiff, submitted an affidavit in

support of Plaintiff's application for disability benefits. A.R. 327-28. Mrs. Brando testified that

Plaintiff was diagnosed with HIV in 1994, and that he continued working until 1999, when he

was no longer able. A.R. 327. Mrs. Brando noted that Plaintiff had lost several jobs due to

absences caused by his illness, and "had lost a lot of weight." A.R. 327. She testified further

that Plaintiff "has always lived with us." A.R. 327.

In terms of Plaintiff's treatment regimen, Mrs. Brando testified that Plaintiff treated

initially with Dr. Bellman, who prescribed him Sustiva, Zerit, and Epivir. A.R. 327. Mrs.

Brando stated that the toxicity of the medications adversely affected Plaintiff's liver, causing him to develop Hepatitis B, and resulting in Dr. Bellman swapping out Zerit with AZT. A.R. 327-28. Mrs. Brando testified that Plaintiff suffers from nightmares, night sweats, depression, and nausea as a result of taking Sustiva. A.R. 328. Mrs. Brando also stated that as a result of taking his medication, Plaintiff is "constantly fatigued and depressed and has no appetite." A.R. 328.

### D.    The ALJ's Findings

On June 28, 2013, ALJ Rubini issued a written decision regarding Plaintiff's application for disability benefits. A.R. 595-609. In determining Plaintiff's eligibility for disability benefits, ALJ Rubini applied the standard five-step sequential evaluation process for determining whether an individual is disabled. *See* 20 C.F.R. § 404.1520.

At step one, ALJ Rubini found that Plaintiff had not engaged in substantial gainful activity since July 1, 2000, the alleged onset date, through the date of his decision. A.R. 600.

At step two, ALJ Rubini found that Plaintiff had the following severe impairments: "HIV infection, Hepatitis B, and depression." A.R. 601.

At step three, ALJ Rubini found that Plaintiff does not have an impairment, or combination of impairments, that meets or medically equals the severity of one of the listed impairments under that Act that would qualify for disability benefits. A.R. 601-04. ALJ Rubini began his evaluation of step three by chronicling Plaintiff's medical evidence, noting that his decision adopted the summary of the medical evidence contained in the ALJ Yatron's prior decision. A.R. 601-603. ALJ Rubini noted that an independent medical expert, Dr. Martin Fethsner, testified, in the 2004 hearing before ALJ O'Leary, that "claimant's impairments did not meet or equal any listed impairment," and found that Plaintiff had not "submitted any additional

medical evidence, to change, or contradict, the credible testimony of the medical expert." A.R. 601.

ALJ Rubini found that the medical evidence obtained since the 2004 hearing showed that Plaintiff began treatment at the AAO in July 2006. A.R. 601. ALJ Rubini noted that Plaintiff "continued on a regimen of AZT, 3TC, and efavirenz, and reported no significant side-effects," other than a disruption of his sleep schedule. A.R. 601. ALJ Rubini also indicated that Plaintiff had started treatment for Hepatitis B approximately one year prior to visiting the AAO, and that Plaintiff complained of depression, anhedonia, decreased libido, and an increase in fatigue. A.R. 601. ALJ Rubini explained that Plaintiff denied suicidal or homicidal ideation, and had taken Lexapro and Zoloft to combat his depression, reporting improvement after taking Zoloft. A.R. 601. ALJ Rubini also documented several ailments over the course of Plaintiff's treatment, including a viral respiratory infection in August 2006, a plantar wart in January 2008, and right shoulder discomfort in June 2008. A.R. 601-02.

After conducting a thorough review of Plaintiff's medical record, ALJ Rubini found that Plaintiff adduced no evidence to warrant a finding that he met or medically equaled Listing 14.08 regarding HIV. A.R. 602. Similarly, ALJ Rubini found that Plaintiff "did not have liver disease, meeting the criteria of Listing 5.05," and that the severity of Plaintiff's mental impairment did not meet or medically equal the criteria of listing 12.04. A.R. 602-03.

In making this step three determination, ALJ Rubini considered whether the "paragraph B" criteria were satisfied, *i.e.*, whether the impairments alleged resulted in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A.R. 603. A limitation is

"marked" if it is more than moderate, but less than extreme.  A.R. 603.  Repeated episodes of

decompensation, each of extended duration, means three episodes within one year, or an average

of once every four months, each lasting for at least two weeks.  A.R. 603.

ALJ Rubini found that Plaintiff has a "mild restriction" in activities of daily living.  A.R.

603.  In that regard, ALJ Rubini noted that Plaintiff currently lives with his parents, but found

that "there is no indication that he cannot attend to his personal needs.  He testified that he

spends the day relaxing, goes on the computer to read news, and watches television for about an

hour a day."  A.R. 603.  ALJ Rubini also placed emphasis on the fact that Plaintiff had testified,

during a psychological evaluation in November 2006, that he watched television and used the

computer in the morning, "fixed simple meals for himself, took a nap in the afternoon, ate dinner

with his family, and then visited with friends in the evening."  A.R. 603.  ALJ Rubini noted that

Plaintiff denied having issues with money management, although he was financially dependent

on his parents due to his lack of income.  AR. 603.

Similarly, ALJ Rubini found that Plaintiff had only "mild difficulties" in social

functioning.  A.R. 603.  To that end, ALJ Rubini reasoned that Plaintiff testified that he sees a

friend a few times a year, goes to church with his parents once a month, goes to the store with his

parents a few times a year, and, at one point a few years prior to the date last insured, had told an

examining psychologist that he "regularly spends the evening visiting with friends."  A.R. 603.

Accordingly, ALJ Rubini concluded that there was "no evidence that [Plaintiff] cannot interact

appropriately with other people, in routine, public situations."  A.R. 603-04.

With regard to concentration, persistence, and pace, ALJ Rubini found, based upon

Plaintiff's mental status evaluations, that Plaintiff had "moderate difficulties."  A.R. 604.  ALJ

Rubini noted that Plaintiff "had not submitted any evidence of psychiatric evaluation or

treatment for the past several years." A.R. 604. Finally, ALJ Rubini found that Plaintiff had

"experienced no episodes of decompensation, which have been of an extended duration." A.R.

604. Thus, ALJ Rubini concluded that "[b]ecause the claimant's mental impairment does not

cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of

decompensation, each of extended duration, the 'paragraph B' criteria are not satisfied." A.R.

604. ALJ Rubini also considered the "paragraph C" criteria of the Listings of Impairments,

pursuant to SSR 96-8p, finding that the evidence failed to establish the presence of the

"paragraph C" criteria. A.R. 604.

At step four, ALJ Rubini found that Plaintiff had the residual functional capacity to

perform light work as defined in 20 CFR §§ 404.1567(b) and 416.967(b), except limited to jobs

which do not involve complex instructions. A.R. 604. In reaching this RFC determination, ALJ

Rubini considered Plaintiff's statements concerning his own limitations, relevant medical

evidence concerning both his alleged physical and mental impairments, and medical source

opinion evidence. A.R. 604-06.

ALJ Rubini noted initially that Plaintiff's alleged symptoms and limitations consisted

primarily of various side-effects from his medications, including feeling "tired" and "like he has

the flu," as well as lower back and leg pain, difficulty concentrating, anxiety, and depression.

A.R. 605. ALJ Rubini then found that while Plaintiff's "medically determinable impairments

could reasonably be expected to cause the alleged symptoms; . . . [Plaintiff's] statements

concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely

credible," since they could not be corroborated by the relevant medical evidence. A.R. 605.

ALJ Rubini discredited the opinion evidence of Dr. Bellman, Plaintiff's prior treating

physician, that Plaintiff was disabled, on the grounds that Dr. Bellman's opinion was not

supported by his own treatment records, or records from other treating sources.[2]  A.R. 605-06.

In rendering that opinion, Dr. Bellman indicated "that he had treated the claimant for

complications of AIDS, including anemia, neutropenia, recurrent infections, depression, and

chronic Hepatitis B," and stated that Plaintiff "required weekly injections of growth factors to

maintain his white and red cells at a safe range, and required frequent monitoring for toxicity and

the determination of efficacy of his medication."  A.R. 605.  ALJ Rubini found that Dr.

Bellman's opinion was not supported by his own treatment records, as the majority of Plaintiff's

laboratory results "were within normal levels, including red blood cells," and Plaintiff's records

did "not show that the claimant had persistent anemia or immune system compromise of a degree

that is associated with opportunistic infections or other HIV-related complications."  A.R. 605.

Indeed, ALJ Rubini noted that Plaintiff's "[s]ubsequent lab studies show that his viral load was

low, and his CD4 count within normal range."  A.R. 605.

Conversely, ALJ Rubini assigned significant weight to the opinions of Dr. Yozviak and a

State agency medical consultant[3]; opinions which ALJ Rubini concluded undermined the

opinion of Dr. Bellman.  A.R. 605-06.  Specifically, ALJ Rubini noted that on June 23, 2008, Dr.

Yozviak recommended that Plaintiff "return to work as soon as possible to ensure financial

stability later in life, and also improve mood and outlook."  A.R. 605.  ALJ Rubini found that

this recommendation was "consistent with Dr. Yozviak's own treatment records, which show

that [Plaintiff's] condition is stable; he has no significant HIV-related complications; his CD4

---

[2] In rejecting Dr. Bellman's opinion, ALJ Rubini noted that Dr. Bellman failed to specify or explain any exertional or non-exertional limitations.  A.R. 606.
[3] ALJ Rubini did not identify by name the State agency medical consultant that conducted the February 28, 2001 evaluation of Plaintiff, and the Court is unable to discern the identity of that individual from the record.  A.R. 269-76.

count was well above the level associated with an increased risk of opportunistic infection, and, in fact, his viral load was at times, undetectable." A.R. 605-06.

ALJ Rubini also assigned significant weight to a physical residual capacity assessment that was completed by a medical consultant for the State agency on February 28, 2001. A.R. 606. In that assessment, the State consultant concluded that Plaintiff:

> [C]ould lift and carry 20 pounds occasionally and 10 pounds frequently; could stand and/or walk about six hours in an eight-hour workday; and could sit for about six hours, in an eight-hour workday; his ability to push and pull was unlimited, for hand and foot controls; he had no postural, manipulative, visual, communicative, or environmental limitations.

A.R. 606, 270-76.

Finally, ALJ Rubini analyzed the opinion of Darren C. Aboyoun, Ph.D., a psychologist who conducted a psychiatric evaluation of Plaintiff in November 2006. Dr. Aboyoun concluded that Plaintiff was able follow and understand simple instructions, perform simple tasks independently or with supervision, relate adequately to others, and learn new tasks. A.R. 606. Dr. Aboyoun also found that Plaintiff "might have some difficulty maintaining a regular schedule," and that Plaintiff had a limited ability to maintain attention and concentration, perform new complex tasks independently, make appropriate decisions, and deal with stress. A.R. 606. ALJ Rubini noted that there was no evidence that Plaintiff followed Dr. Aboyoun's recommendation to pursue counseling, that Plaintiff has ever been under the regular treatment of a psychologist or psychiatrist, or that Plaintiff had been treated for a panic or anxiety disorder. A.R. 606. Accordingly, ALJ Rubini found that Plaintiff's limitations "do not appear to preclude work involving relatively simple instructions or routine/repetitive work." A.R. 606.

ALJ Rubini found that Plaintiff is capable of performing past relevant work as either: (1) a customer service associate, which is a sedentary, semi-skilled position associated with DOT

249.362-026; or (2) a counter clerk, which is a light, unskilled position associated with DOT 311.477-014. A.R. 607. In that regard, ALJ Rubini considered VE Turetzky's testimony that a person with a marked inability to focus could not keep up with the workload associated with those positions, but a person with a moderate limitation on the inability to focus could. A.R. 607. ALJ Rubini then compared Plaintiff's RFC to the physical and mental demands of those positions, and concluded that Plaintiff would be able to perform such work "as generally performed." A.R. 607.

Alternatively, at step five, despite his prior determination that Plaintiff retained the RFC to perform his past relevant work, ALJ Rubini found that, taking into consideration Plaintiff's age, education, work experience, and RFC, "there are other jobs existing in the national economy that he is also able to perform." A.R. 607-08. In reaching this determination, ALJ Rubini relied on the testimony of VE Turetzky, who was asked to assess a hypothetical claimant who "could not understand, remember, and carry out complex or detailed instruction, and could only perform simple instructions or routine/repetitive work; could have limited contact with the public; and had difficulty maintaining concentration and attention for long periods." A.R. 608. VE Turetzky testified that such an individual could "could perform jobs at the medium exertional level, including: industrial sweeper (DOT code 389.683-010, 2,000 jobs nationally, I ,000,000 jobs nationally); laundry laborer (DOT code 361.687-018, 1,000 jobs locally, 100,000 jobs nationally)." A.R. 608. VE Turetzky also testified that, "assuming that the claimant was limited to light work, he could perform jobs such as office cleaner (DOT code 323.687-014, 500 jobs locally, and 200,000 jobs nationally); and, at the sedentary level, he could perform a job as a table worker." A.R. 608. ALJ Rubini concluded that VE Turetzky's testimony was consistent with the information contained in the Dictionary of Occupational Titles. A.R. 608. Therefore,

ALJ Rubini found that Plaintiff "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." A.R. 608.

Accordingly, the ALJ concluded that "[t]he claimant has not been under a disability, as defined in the Social Security Act, from July 1, 2000, through the date of this decision." A.R. 609.

## II.    STANDARD OF REVIEW

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record." 42 U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). "It means such relevant evidence as a reasonable mind might accept as adequate." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), *cert. denied*, 507 U.S. 924 (1993). Accordingly, even if there is contrary evidence in the record

that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence. *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. *See* 42 U.S.C. § 423(c). Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A); *see Plummer*, 186 F.3d at 427. An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability. *Id.* at § 1382c (a)(3)(A)-(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled. *See* 20 C.F.R. § 404.1520. First, the ALJ determines whether the claimant has shown that he or she is not currently engaged in "substantial gainful activity." *Id.* at § 404.1520(a); *see Bowen v. Yuckert*, 482 U.S. 137, 146-47 n.5 (1987). If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits. *See* 20 C.F.R. § 404.1520(b); *see also Bowen*, 482 U.S. at 140. Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c); *see Bowen*, 482 U.S. at 146-47 n.5. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). These activities

include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." *Id.* A claimant who does not have a severe impairment is not considered disabled. *Id.* at § 404.1520(c); *see Plummer*, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List"). 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant demonstrates that his or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits. *See id.* at § 404.1520(d); *see also Bowen*, 482 U.S. at 146-47 n.5. If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. *See* 20 C.F.R. § 404.1526(a). If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. *Id.* An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. *Williams*, 970 F.2d at 1186.

If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he or she retains the "residual functional capacity" ("RFC") to perform his or her past relevant work. 20 C.F.R. § 404.1520(e); *Bowen*, 482 U.S. at 141. If the claimant is able to perform previous work, the claimant is determined to not be disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141-42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. *Plummer*, 186 F.3d at 428. Finally, if it is determined that the claimant is no longer able to perform his or her previous work, the burden of production then shifts to the Commissioner to

show, at step five, that the "claimant is able to perform work available in the national economy." *Bowen*, 482 U.S. at 146-47 n.5; *Plummer*, 186 F.3d at 428. This step requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience. 20 C.F.R. § 404.1520(f). The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant is capable of performing work and not disabled. *Id*.

## III.   PLAINTIFF'S ARGUMENTS ON APPEAL

Plaintiff raises three arguments on appeal as to why the ALJ's disability determinations were unsupported by substantial credible evidence. First, Plaintiff argues that ALJ Rubini's assessment of Plaintiff's RFC lacks an adequate evidentiary foundation. Second, Plaintiff also argues that ALJ Rubini erred at step four by determining that, given Plaintiff's RFC, Plaintiff could perform his past relevant work. Third, Plaintiff argues that ALJ Rubini erred in finding that, given Plaintiff's RFC, Plaintiff could perform other work available in the national economy. The Court addresses each argument in turn.

### A.   Determination of Residual Functional Capacity

At step four, ALJ Rubini determined that Plaintiff had the RFC to "perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except limited to jobs which do not involve complex job instructions." A.R. 604. Plaintiff challenges ALJ Rubini's RFC findings, arguing that ALJ Rubini's RFC determination was not based on substantial evidence in the record. Pl.'s Br. at 19-26. Specifically, he argues that: (1) ALJ Rubini failed to articulate a sufficient basis for his RFC assessment; (2) ALJ Rubini improperly weighed the medical opinion evidence; (3) ALJ Rubini improperly evaluated Plaintiff's credibility; and (4) ALJ Rubini failed to address all probative evidence in rendering his RFC determination.

#### 1.   *Substantial Evidence Supports ALJ Rubini's RFC Assessment*

Plaintiff challenges both the physical and mental components of ALJ Rubini's RFC assessment, arguing that ALJ did not sufficiently articulate a rationale for his RFC assessment.

The ALJ is responsible for making the ultimate determination of an individual's RFC. 20 C.F.R. § 404.1546; *see Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) ("The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations."). "[I]n making a residual functional capacity determination, the ALJ must consider all evidence before him," and, although the ALJ may weigh the credibility of the evidence, he must "give some indication of the evidence which he rejects and his reason(s) for discounting such evidence." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000); *see Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981); *see also Goldberg v. Colvin*, No. 13-6055, 2015 U.S. Dist. LEXIS 31012, at *24-25 (D.N.J. Mar. 13, 2015). "In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter*, 642 F.2d at 705. For example, in *Burnett*, the Third Circuit determined that remand was warranted, because the ALJ "fail[ed] to consider and explain his reasons for discounting all of the pertinent evidence before him in making his residual functional capacity determination." 220 F.3d at 121. "Where the ALJ's findings of fact are supported by substantial evidence, [district courts] are bound by those findings, even if [the courts] would have decided the factual inquiry differently." *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 292 (3rd Cir. 2012) (internal quotation marks and citation omitted).

Here, in determining Plaintiff's RFC, ALJ Rubini satisfied his obligations to consider all relevant evidence, and to provide reasoning for accepting or rejecting certain evidence. In assessing Plaintiff's RFC, ALJ Rubini considered the objective medical evidence and Plaintiff's subjective complaints. As mandated by *Cotter*, ALJ Rubini identified the medical and opinion

evidence that supported his assessment that Plaintiff was capable of performing "light work," limited to jobs that do not involve complex job instructions. Specifically, ALJ Rubini considered the following evidence: (1) Plaintiff's statements concerning the intensity, persistence, and limiting effects of his alleged symptoms and limitations, including Plaintiff's testimony that he "has serious side-effects from medications, he always feels tired and like he has the flu, and he has lower back pain," as well as Plaintiff's testimony that he has "difficulty concentrating" and suffers from depression and anxiety, A.R. 605; (2) the medical opinion of Dr. Bellman that Plaintiff was "disabled due to AIDS," A.R. 190, 605; (3) Dr. Yozviak's medical opinion and treatment records, which indicated that Plaintiff's condition was "stable," and included a recommendation that Plaintiff return to work, A.R. 605, 822, 830; (4) the treatment records of the various treating sources in this case; (5) the opinion of a medical consultant for the State agency, indicating that Plaintiff could "lift and carry 20 pounds occasionally and 10 pounds frequently; could stand and/or walk about six hours in an eight-hour workday; and could sit for about six hours, in an eight-hour workday; his ability to push and pull was unlimited, for hand and foot controls; he had no postural, manipulative, visual, communicative, or environmental limitations," A.R. 606; and (6) the opinion of examining psychologist Dr. Aboyoun, who concluded, *inter alia*, that Plaintiff "could follow and understand simple instructions, and could perform simple tasks independently, or with supervision," but had a limited ability to maintain attention and concentration, and might have some difficulty maintaining a regular schedule," A.R. 606, 775-76.

ALJ Rubini engaged in a thorough analysis of those opinions, comparing them to the relevant treatment records. In so doing, he provided adequate reasons for accepting certain medical opinions, while discrediting others. Importantly, ALJ Rubini indicated that Dr. Bellman's opinion that Plaintiff was "disabled due to AIDS" was inconsistent with Plaintiff's treatment records,

wherein Plaintiff generally reported feeling well, A.R. 135, 210-11, 222-23, 606, and which showed that Plaintiff's HIV, Hepatitis B, and anemia were stable and well-controlled. A.R. 135, 222-23, 393, 606, 753, 830. Accordingly, the Court finds that ALJ Rubini supported his decision with a "clear and satisfactory explication of the basis on which its rests." *Cotter*, 642 F.2d at 705.

### 2. *ALJ Rubini Properly Weighed the Medical Opinion Evidence*

Next, Plaintiff contends that ALJ Rubini improperly weighed the medical opinion evidence in formulating Plaintiff's RFC. Pl.'s Br. at 15-16, 24-26. The Court disagrees.

Under 20 C.F.R. § 404.1527(c)(2), a treating source's opinion will be given controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Several factors may also be used to determine the weight given to a medical opinion including: the length of the treatment relationship; the nature and extent of the treatment relationship; supportability by the medical evidence; and consistency with the record as a whole. *Id.* If a treating source's opinion conflicts with that of a non-treating source, "the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reasons." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). That is, the ALJ must rely only on "contradictory medical evidence" in rejecting the treating source's opinion, rather than "credibility judgments, speculation or lay opinion." *Id.* An ALJ is required to provide "an explanation of the reasoning behind [his] conclusions," including "reason(s) for discounting rejected evidence." *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d. Cir. 2001).

In this case, Plaintiff argues that ALJ Rubini's determination that Plaintiff could perform "light work" is inconsistent with the opinion of Dr. Bellman that Plaintiff was "disabled due to AIDS." A.R. 190. To that end, Plaintiff maintains that ALJ Rubini improperly rejected the opinion of Dr. Bellman, based on his own lay opinion of the medical record.

ALJ Rubini rejected Dr. Bellman's opinion of Plaintiff's disability, on the grounds that Dr. Bellman's opinion did not "explain or specify any limitations," and was not supported by "either his own treatment records, or records from other treating sources." A.R. 606. While Dr. Bellman concluded that Plaintiff suffered from AIDS and complications arising therefrom, and required weekly injections to maintain his white and red cells at a safe range, ALJ Rubini found that these conclusions were inconsistent with Dr. Bellman's own treatment records, which showed that Plaintiff's "lab studies were within normal levels, including red blood cells," and did "not show that the claimant had persistent anemia or immune system compromise of a degree that is associated with an opportunistic infections or other HIV-related complications." A.R. 605. Specifically, ALJ Rubini discussed the following excerpts from Dr. Bellman's treatment notes:

> In July 2001, his hemoglobin was 12.02 and his hemoglobin was 35%, which indicates anemia. His CD4 count was 272. In August 2001, his hematocrit was 44.7%, and hemoglobin was 15.2, both within normal range. His CD4 count was 351. On October 8, 2001, his hemoglobin was 14.2 and hematocrit was 41%, also within normal range, and his CD4 count was 334. On November 17, 2001, his hemoglobin was 12.7 and hematcrit was 37.3%, within normal range (Exhibit 8F).

A.R. 605. Indeed, it appears Dr. Bellman's proscribed treatment for Plaintiff at that time was effective.

ALJ Rubini also found Dr. Bellman's conclusion that Plaintiff was disabled inconsistent with the treatment records of another of Plaintiff's treating physicians, Dr. Yozviak, who recommended that Plaintiff "return to work as soon as possible to ensure financial stability later in life, and also improve mood and outlook." A.R. 605. ALJ Rubini found that Dr. Yozviak's recommendation was consistent with his own treatment records, which showed that Plaintiff's viral load was "undetectable," and that Plaintiff's CD4 count was above the level associated with an increased risk of opportunistic infection. A.R. 761-63. Dr. Yozviak's records also show that

Plaintiff denied having any significant side effects from his medication, exercised three times per week, and exhibited a normal mood, attention span, and concentration. A.R. 827-29.

Accordingly, because ALJ Rubini's rejection of Dr. Bellman's opinion was based on "contradictory evidence," rather than "credibility judgments, speculation or lay opinion," *Morales*, 225 F.3d at 317, and ALJ Rubini provided an adequate basis for rejecting Dr. Bellman's opinion, the Court finds that ALJ Rubini did not err in rejecting Dr. Bellman's opinion.

Plaintiff also argues that ALJ Rubini improperly discredited the finings of Dr. Aboyoun. Pl.'s Br. at 17. In addressing Dr. Aboyoun's psychiatric evaluation of Plaintiff, ALJ Rubini noted that Dr. Aboyoun found that Plaintiff could follow simple instructions and perform simple tasks, his ability to maintain attention and concentration, perform complex tasks, make appropriate decisions, and maintain a regular schedule, was "limited." A.R. 606. Plaintiff maintains that ALJ Rubini rejected Dr. Aboyoun's opinion, based on ALJ Rubini's statement that Dr. Aboyoun's "assessment was based on the claimant's own statements, not Dr. Aboyoun's own observations or clinical findings, based on an established treatment relationship." A.R. 606. Plaintiff overstates the implications of ALJ Rubini's finding. While ALJ Rubini may have accorded Dr. Aboyoun's opinion little weight, he did not outright reject that opinion. To the contrary, ALJ Rubini found that, even accepting Dr. Aboyoun's limitations, those "limitations do not appear to preclude work involving relatively simple instructions or routine/repetitive work." A.R. 606. Moreover, even if Dr. Aboyoun's opinion should have been accorded substantial weight, that opinion still would not preclude Plaintiff from performing unskilled work. Accordingly, ALJ Rubini's weighing of Dr. Aboyoun's testimony does not provide an adequate basis for remand.

### 3. ALJ Rubini Properly Evaluated Plaintiff's Credibility

Plaintiff argues that ALJ Rubini's determination of Plaintiff's RFC was improper, because ALJ Rubini erred in determining that Plaintiff's testimony was "not entirely credible," as well as in failing to consider the affidavit of Plaintiff's mother. A.R. 605. Credibility determinations are entitled to substantial deference on appeal. *See Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003) (stating that courts "ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor."); *see also Izzo v. Comm'r of Soc. Sec.*, 186 Fed. Appx. 280, 286 (3d Cir. 2006) (finding that "a reviewing court typically defers to an ALJ's credibility determination so long as there is a sufficient basis for the ALJ's decision to discredit a witness.").

A claimant's subjective symptoms must be corroborated by objective medical evidence; *i.e.*, evidence of a medically determinable impairment that can reasonably be expected to produce the claimant's underlying symptoms. *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999) (citing 20 C.F.R. § 404.1529). If the ALJ determines that a medical impairment that could reasonably cause the alleged symptoms exists, he must evaluate the "intensity, persistence, and functionally limiting effects of the symptoms" to determine the extent to which it affects the Plaintiff's ability to work. SSR 96-7p, 1996 SSR LEXIS 4 (S.S.A. July 2) at *2[4]; *Garibay v. Comm'r Of Soc. Sec.*,

---

[4] The Court notes that although the parties do not raise this issue, SSR 96-7p has been superseded by SSR 16-3p, which alters the standard by which ALJs are to evaluate a claimant's symptoms. Specifically, SSR 16-3p eliminates the word "credibility" from the sub-regulatory policy because the regulations do not use the term. SSR 16-3p, 2016 WL 1119029, at *1 (S.S.A.). However, SSR 16-3p became effective on March 16, 2016, after the ALJ rendered his June 28, 2013 decision in this case. Accordingly, ALJ Rubini was bound by SSR 96-7p, not SSR 16-3p, and the Court will evaluate his decision under the former standard. *See Sponheimer v. Comm'r of Soc. Sec.*, No. 15-4180, 2016 WL 4743630, at *6 (D.N.J. Sept. 8, 2016) (finding that the ALJ was bound to evaluate Plaintiff's testimony regarding his symptoms under SSR 96-7p, because SSR 16-3p became effective after the ALJ's decision). Nonetheless, even if ALJ Rubini was bound by SSR 16-3p, this Court's analysis of Plaintiff's subjective symptoms remains

336 F. App'x 152, 157 (3d Cir. 2009). "This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects." SSR 96-7p, at *2; *Garibay*, 336 F. App'x at 157. In complying with this standard, "[i]t is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" SSR 96-7p, at *3. Rather, the decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, at *3-4.

In evaluating a claimant's subjective complaints of pain, the ALJ considers factors such as the objective medical evidence, treatment course and effectiveness, daily activities, the type, dosage, effectiveness, and side effects of any medication that the claimant is taking, as well as the consistency of the claimant's statements with the evidence of record. 20 C.F.R. § 404.1529(c). Rejection of subjective testimony must be based on substantial evidence. *See VanHorn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983).

Here, in accordance with SSR 96-7p, and based on the objective medical evidence, ALJ Rubini first found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . ." A.R. 605. However, in considering Plaintiff's credibility, as he was required to do, ALJ Rubini concluded that Plaintiff's "statements concerning

---

the same. SSR 16-3p states that an ALJ must evaluate a claimant's symptoms based on all evidence in the record, and not the claimant's character. In this case, ALJ Rubini discounted Plaintiff's testimony because portions of it conflicted with the relevant medical evidence, not because of Plaintiff's character. ALJ Rubini's decision thus comports with the new standard promulgated in SSR 16-3p.

the intensity, persistence and limiting effects of these symptoms [were] not entirely credible," since they could not be corroborated by the relevant medical evidence. A.R. 605. In so doing, ALJ Rubini did not merely support his finding with a conclusory statement; rather, he expanded on his finding by analyzing the objective medical evidence, Plaintiff's statements to his treating physicians, and Plaintiff's treatment record.

In regards to Plaintiff's complaints concerning side effects from his medications, including feeling tired and suffering from flu-like symptoms, ALJ Rubini found that Plaintiff's complaints were undermined by the objective medical evidence, Plaintiff's subjective statements, and Plaintiff's treatment records. To wit, ALJ Rubini explained that Plaintiff's statements to his treating sources that he "felt well" and experienced "no significant symptoms or medication side-effects" were inconsistent with his testimony that he "constantly felt ill" and was "too tired to work." A.R. 606. Additionally, ALJ Rubini noted that Plaintiff's medical results showed that his HIV and Hepatitis B were "stable" and "adequately controlled." A.R. 606.

Furthermore, ALJ Rubini also provided an adequate basis for finding Plaintiff's alleged psychiatric impairments were not credible. In that regard, ALJ Rubini explained that Plaintiff's medical records showed a "limited psychiatric treatment history," consisting of low dosage anti-depressant medication, with "no evidence" that Plaintiff "has ever been under the regular treatment of a psychologist or psychiatrist," or that Plaintiff had "ever been diagnosed or treated for a panic or anxiety disorder." A.R. 606. Accordingly, in discounting Plaintiff's subjective complaints, the record indicates that ALJ Rubini considered them in light of the objective medical evidence in the record, as the regulations and this circuit's law require.

Plaintiff's contention that ALJ Rubini erred by failing to reference the affidavit of Plaintiff's mother, Shirley Brando, is also without merit. While the regulations advise that an

ALJ "may" draw inferences and conclusions about the credibility of a claimant's statements from statements of lay witnesses, including the claimant's family and friends, it is harmless error for an ALJ to omit statements that are merely duplicative of the Plaintiff's own claims. *See Crosby v. Barnhart*, 98 F. App'x 923, 926 (3d Cir. 2004) ("Crosby contends that it was error for the ALJ to reject her fiancé's affidavit detailing her daily physical limitations. We need not dwell on this issue, because any error, if present, was harmless. The fiancé's description of Crosby's limitations mirrored her own description, which the ALJ considered."). Here, Mrs. Brando's affidavit was cumulative of Plaintiff's own statements, which ALJ Rubini considered thoroughly. Accordingly, because ALJ Rubini's failure to reference Mrs. Brando's affidavit specifically was not prejudicial to Plaintiff, that failure does not provide a basis for remand or reversal. *See Rosa v. Colvin,* 956 F.Supp.2d 617, 624–25 (E.D. Pa. 2013) ("Under the harmless error rule, an error only warrants remand if it prejudiced a party's 'substantial rights.' ") (citing *Shinseki v. Sanders,* 556 U.S. 396, 407 532 (2009)).

### 4. *ALJ Rubini Adequately Addressed All Probative Evidence in Rendering his RFC Determination*

Plaintiff also maintains that ALJ Rubini failed to address certain probative evidence in rendering his RFC determination. Specifically, Plaintiff argues that ALJ Rubini erred in assessing Plaintiff's RFC because he did not consider explicitly: (a) the testimony of VE Meola and VE Baine in prior hearings in Plaintiff's case; (b) Dr. Fethsner's RFC determination; and (c) the reports of Dr. Fugate and Dr. Baharlias.

First, Plaintiff contends that ALJ Rubini erred in failing to reference specifically the testimony of two prior vocational experts, VE Meola and VE Baine, given at prior hearings before different ALJs in this case. Pl.'s Br. at 34-35. However, where an ALJ properly relies on the testimony of one vocational expert, "he need not address the testimony of another VE." *Villa v.*

*Astrue*, No. 11-8992, 2012 WL 2847730, at *3 (C.D. Cal. July 11, 2012), *aff'd sub nom. Villa v. Colvin*, 540 F. App'x 639 (9th Cir. 2013); *see Johnson v. Colvin*, No. 14-1167, 2015 WL 1954644, at *4 (W.D. Pa. Apr. 29, 2015) ("As a general matter, the ALJ properly relied on the vocational expert's testimony from the Second Hearing, and was not required to address the vocational expert's testimony from the First Hearing."); *Ramirez v. Comm'r of Soc. Sec. Admin.*, 463 F. App'x 640, 643 (9th Cir. 2011) ("[D]espite the ALJ's lack of explanation for not relying on the testimony of the unavailable vocational expert from the first hearing, the ALJ properly relied on the vocational expert's testimony at the second hearing . . . ."). Here, ALJ Rubini properly relied on the testimony of VE Turetzky in determining whether Plaintiff is capable of performing his past relevant work. Thus, ALJ Rubini's failure to address the testimony of the prior vocational experts is not a basis for remand or reversal.[5]

Second, Plaintiff maintains that ALJ Rubini erred in failing to explain why he rejected the RFC finding of Dr. Fethsner. Pl.'s Br. at 15-16. At the February 19, 2004 hearing before ALJ O'Leary, Dr. Fethsner testified that, taking into account Plaintiff's anemia, white blood cell count, and CD4 count, as well as the general weakness that would occur given Plaintiff's condition, Plaintiff "would be limited to sedentary activity at this point." A.R. 557-58. While the Court acknowledges that ALJ Rubini did not address Dr. Fethsner's opinion that Plaintiff was limited to sedentary work, finding instead that Plaintiff could perform "light work," ALJ Rubini's omission constitutes harmless error. To that end, while Dr. Fethsner's opinion as to Plaintiff's exertional

---

[5] Moreover, even assuming that his testimony was relevant, VE Meola did not testify that an individual with Plaintiff's RFC could not find substantial gainful employment in the national economy; rather, VE Meola opined that a person restricted to sedentary work, with a moderate restriction due to fatigue and ability to maintain concentration and persistence of pace, could perform jobs existing in the national economy, including jobs as a "ticketer," "parts sorter," [or] "order clerk." A.R. 578.

limitations differs from that of ALJ Rubini, Plaintiff would not have been entitled to disability even if Dr. Fethsner's opinion was accepted by ALJ Rubini. Indeed, Dr. Fethsner also testified that he disagreed with Dr. Bellman's opinion that Plaintiff was "disabled as far as Social Security criteria." A.R. 575. Moreover, the ultimate decision as to a claimant's RFC is left to the ALJ, not an independent medical expert. 20 C.F.R. § 404.1546. Accordingly, ALJ Rubini's decision not to address Dr. Fethsner's RFC determination does not warrant remand.

Third, Plaintiff maintains that ALJ Rubini erred in determining the mental component of Plaintiff's RFC, because he did not reference the opinions of Dr. Fugate and Dr. Baharlias. As with the opinion of Dr. Fethsner, neither the opinion of Dr. Fugate nor Dr. Baharlias is material to Plaintiff's RFC determination, and thus, ALJ Rubini's decision not to reference those opinions in his decision was harmless error. In that regard, Dr. Fugate opined that Plaintiff's limitations ranged from mild to moderate, but were not marked, and concluded that Plaintiff "appears capable of performing simple, repetitive, work-related tasks." A.R. 505, 517. Additionally, following a cognitive screening of Plaintiff, Dr. Baharlias opined that while there was a "possibility" that Plaintiff had a cognitive disorder, he did not "see any specific signs at this time, of a significant impairment or what is called the HIV cognitive motor complex . . . ." A.R. 488. Moreover, Dr. Baharlias found that Plaintiff was "capable of managing his funds on his own . . . ." A.R. 488. Accordingly, nothing in the opinions of Dr. Fugate or Dr. Baharlias undermine ALJ Rubini's conclusion that Plaintiff could perform light work, limited to jobs which do not involve complex instructions.

## B.     Determination of Plaintiff's Ability to Perform Past Work

Plaintiff also argues that ALJ Rubini erred at step four by determining that, given Plaintiff's RFC, Plaintiff could perform his past relevant work. Pl.'s Br. at 31-35. Specifically, ALJ Rubini

found that Plaintiff had the RFC to perform his past relevant work as a customer service representative and a counter clerk.  A.R. 607.

In assessing a claimant's past relevant work:

(1) the ALJ must make specific findings of fact as to the claimant's residual functional capacity; (2) the ALJ must make findings of the physical and mental demands of the claimant's past work; and (3) the ALJ must compare the residual functional capacity to the past relevant work to determine whether claimant has the level of capability needed to perform the past relevant work.

*Garibay*, 336 F. App'x at 158 (quoting *Burnett*, 220 F.3d at 120). According to the Social Security Administration:

The claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level, exertional demands and nonexertional demands of such work. Determination of the claimant's ability to do [past relevant work] requires a careful appraisal of (1) the individual's statements as to which past work requirements can no longer be met and the reason(s) for his or her inability to meet those requirements; (2) medical evidence establishing how the impairment limits ability to meet the physical and mental requirements of the work; and (3) in some cases, supplementary or corroborative information from other sources such as employers, the Dictionary of Occupational Titles, etc., on the requirements of the work as generally performed in the economy.

*Titles II & XVI: A Disability Claimant's Capacity to Do Past Relevant Work, in Gen.*, SSR 82–62 (S.S.A. 1982); *see also Burnett*, 220 F.3d at 120; *Garibay*, 336 F. App'x at 158.  In evaluating this evidence, the ALJ should find whether "the claimant retains the capacity to perform the particular functional demands and job duties peculiar to an individual job as he or she actually performed it" or whether "the claimant retains the capacity to perform the functional demands and job duties of the job as ordinarily required by employers throughout the national economy."  SSR 82–61.  The ALJ may rely on job descriptions found in the Dictionary of Occupational Titles ("DOT") to assist in determining the ordinary job requirements of the occupations in question.  *Id.* "If the claimant cannot perform the excessive functional demands and/or job duties actually required in the former job but can perform the functional demands and job duties as generally required by employers

throughout the economy, the claimant should be found to be 'not disabled.'" *Garibay*, 336 F. App'x at 158 (citing SSR 82–61).

In this case, ALJ Rubini found that Plaintiff has the RFC to perform "light work," limited to jobs that do not involve complex job instructions. A.R. 604. As noted above, ALJ Rubini made specific findings regarding Plaintiff's RFC; findings that were supported by substantial evidence in the record. ALJ Rubini then examined the testimony of VE Turetzky, who classified Plaintiff's past relevant work experience as a customer service representative as sedentary, semi-skilled work, with a SVP of 4 (DOT 249.362-026), and his past work experience as a counter clerk as light, unskilled work, with a SVP of 2 (DOT 311.477-014). ALJ Rubini then compared Plaintiff's RFC with his past relevant work, finding that the physical and mental demands of those positions did not exceed the capabilities of someone with Plaintiff's RFC. A.R. 607. ALJ Rubini properly evaluated Plaintiff's impairments and subjective complaints in light of the objective medical evidence and his stated activities of daily living, and thus, ALJ Rubini's conclusion that Plaintiff retained the RFC to perform the job requirements of customer service representative or counter clerk is supported by substantial evidence.

## C. Determination of Plaintiff's Ability to Perform Other Work Available in the National Economy

Finally, Plaintiff contends that ALJ Rubini erred at step five, by determining that Plaintiff could perform other kinds of substantial gainful work existing in the national economy. Pl.'s Br. at 34. At step five, the ALJ must determine whether there are jobs existing in significant numbers in the national economy that are capable of being performed by the claimant, after considering the claimant's age, education, past work experience, and residual functional capacity. 20 C.F.R. §416.920(g)(1). If the ALJ does find that the plaintiff is capable of performing other work, the ALJ may conclude that the claimant is not disabled. *Id.*

In this case, ALJ Rubini relied on the testimony of VE Turetzky, who was asked whether jobs existed in the national economy for a hypothetical individual with Plaintiff's age, education, work experience, and functional capacity. A.R. 608. Specifically, VE Turetzky was asked to assume that the hypothetical individual "could not understand, remember, and carry out complex or detailed instruction, and could only perform simple instructions or routine/repetitive work; could have limited contact with the public; and had difficulty maintaining concentration and attention for long periods." A.R. 608. Based on the DOT codes provided by the Department of Labor, VE Turetzky responded that such an individual could perform the job of an office cleaner, which involves light, unskilled work, and the job of a table worker, which involves sedentary, unskilled work. A.R. 905-07. ALJ Rubini accepted that testimony, finding that VE Turetzky's testimony was consistent with the information contained in the Dictionary of Occupational Titles, and that the evidence in the record did "not show that the claimant would require an inordinate amount of supervision to perform even simple types of jobs, or that he could not maintain an acceptable level of production pace or quality of work." A.R. 608. And, while Plaintiff argues ALJ Rubini's finding that Plaintiff would be able to find other work existing in the national economy fails to account for VE Turetzky's testimony that a claimant could not sustain employment if he was off task six minutes an hour, two days a week, or absent more than once a month, the hypothetical posed to VE Turetzky accounted for Plaintiff's cognitive limitations. A.R. 608. Furthermore, the ALJ, based on medical evidence, did not find that Plaintiff has any cognitive limitations that would have prevented him from performing other work available in the national economy. Additionally, to the extent Plaintiff argues that ALJ Rubini failed to consider whether his physical limitations would cause him to miss more than one day per month, Plaintiff's argument is not substantiated by the evidence in the medical record. Indeed, Plaintiff has not

presented any evidence to show that the medications he was taking, or the symptoms that he is exhibiting from his impairments, would cause him to consistently miss work, at least one day per month. For these reasons, ALJ Rubini properly found that there are a sufficient number of jobs available in the national economy that Plaintiff can perform.

## IV.    <u>CONCLUSION</u>

For the reasons set forth above, I find that the ALJ's decision was supported by substantial evidence in the record. Accordingly, the ALJ's decision is affirmed. An appropriate Order shall follow.


Dated:  May 31, 2017                                               /s/ Freda L. Wolfson
                                                                            Hon. Freda L. Wolfson
                                                                            United States District Judge